G. W. J. MURPHY CO. v. METAL STAMPING CO.

(District Court, E. D. New York. May 8, 1914.)

1. TRADE-MARKS AND TRADE-NAMES (§ 58*)—INFRINGEMENT.

Where plaintiff's registered trade-mark placed on metal curtain fasteners for carriages and automobiles was merely a circle surrounding the letter "M.," and it appeared that while complainant claimed to have used the mark since 1909 it had filled certain special orders for large customers with goods marked by a circle without the "M." or with a circle and dot in its place, it was not entitled to restrain defendant's alleged infringement of the mark by the use of a circle and dot.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 66, 67; Dec. Dig. § 58.*]

2. PATENTS (§ 328*)—VALIDITY—PATENTABLE NOVELTY.

Murphy patent, No. 853,206, for curtain fasteners for carriages and automobiles, consisting of a rotatable head with two grooves separated by sharp radiating ridges formed by grooves, the other of the two parts having a convex portion adapted to engage and fit into the grooves so as to hold the head in place when turned, *held* invalid for want of patentable novelty.

3. PATENTS (§ 26*)—INVENTION—APPLICATION OF OLD DEVICE TO NEW COMBINATION.

Invention may lie in the application of an old device to a use in combination with another old device, where the result forms a complete device of itself, and where the novelty is found in the application of the two devices as parts of one producing a new result or the old result in a new way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27-30; Dec. Dig. § 26.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 68*)— TRADE-NAMES—UNLAWFUL COMPETITION.

Where complainant's patent for a curtain fastener for carriages and automobiles was invalid, and complainant had permitted other manufacturers to place exactly similar devices on the market without distinguishing labels and without any means of warning the public that the idea belonged to complainant, it could not maintain the suit for unlawful competition in the sale of similar fasteners in absence of proof that they were sold as and for complainant's fasteners.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 79; Dec. Dig. § 68.*]

In Equity. Suit by the G. W. J. Murphy Company against the Metal Stamping Company, for infringement of a trade-mark, a patent, and for unlawful competition. Decree for defendant.

William R. Davis, of New York City, for plaintiff.
William A. Megrath, of New York City, for defendant.

CHATFIELD, District Judge. The present action is complicated by the joinder of charges of unfair competition, brought in this court because of diversity of citizenship of the parties, with allegations of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

infringement of a trade-mark registered November 21, 1911, and with allegations of infringement of a patent issued to George W. J. Murphy, on the 7th of May, 1907, No. 853,206, upon an application filed April 2, 1906. These letters patent have been duly assigned to the plaintiff company.

[1] The registered trade-mark is merely a circle surrounding the letter "M," and the application for registration states that it has been used since 1909. This trade-mark was taken out by this company, and has been used by them since that time upon its goods generally; but it also appears by the testimony that for certain large customers and to fill certain special orders the goods have been placed upon the market without the "M," and with a small circle or dot in its place.

[2] The articles, about the sale of which the present controversy has arisen, are curtain fasteners, and the Murphy patent states that they are "for carriage curtains and the like." The testimony shows that for at least 20 or 30 years fasteners of sheet metal or brass, with a button of ovoid or irregular shape, and capable of being turned so that the longest axis will rest across or at right angles to the long sides of the buttonhole, or opening through which the button is passed, have been used upon carriage covers, and in similar places, like baby-carriage hoods, awnings, etc. Varieties of attachment by rivet, by a single screw, by a plate attached with smaller screws or by prongs (penetrating the material if cloth or leather and bent up on the underside), are old, and are selected merely according to the place in which the button or fastener is to be used. An eyelet or buttonhole has always been provided, whether for the insertion of a round button head or for a turnable head with one axis longer than the other. The use of the ovoid or long head made possible and desirable the employment of a metal or durable eyelet instead of the flexible buttonhole for a round button. Whether or not this eyelet should have a back plate, and whether it should be fastened by prongs through the curtain, to be bent over this back plate or after insertion through holes in the back plate, or in fact whether the eyelet should be sewed or crimped to the curtain, like grommets, were details of construction involving no novelty or invention and chosen because of their convenience or applicability to the use desired.

Larger sizes and greater numbers of covers, through the use of the automobile, motor boat, etc., have increased enormously the number of curtain fasteners needed in the past few years. Another need arose from the excessive strain due to the speed of the automobile and the constant flapping or working of the curtain, with the resultant wear and strain upon the button. Also the advantage of fastening two or three curtains with one button, and resisting flapping strains from all at the same time, has been met by elongating the shank or shaft of the fastener. The difficult circumstances under which curtains were hastily applied, and the use of automobiles at night, made desirable a fastener or button which, with careless or hurried handling, would assume a fixed position, and would, if only partially turned, spring into a locked position, or else return to the point of starting, thus avoiding the liability of being placed in an insecure position when strain was

put upon the curtain by movement of the machine or by wind, thus allowing the curtain to come off from the button, or allowing the button to be forced back to the starting position.

A button that could not, without extreme care, be left at an intermediate position, would be more likely to be properly placed by one in a hurry. Some such considerations led various manufacturers, including the defendant, to place upon the market fasteners with a turn button, for use upon carriages (before the great demand from automobile manufacturers arose) under what have been put in evidence as the Reed & Packard patent, No. 43,928, August 23, 1864, the Snell patent, No. 393,592, November 27, 1888, and Curtis patent, No. 289,991, December 11, 1883, in which the stud has, upon the face against which the button presses, transverse grooves or notches into which a ridge or rib on the lower side of the turn button will be forced by a spring in the head or on the shaft of the turn button, and the Curtis patent, as early as 1883, had the metal eyelet for use in strengthening the buttonhole or slit in the curtain.

It was evident that in all such devices the pressure of the curtain or eyelet, whether constant or intermittent when flapping, is exerted against the spring which holds the button head into the notches, or against the end of the stud, and if this pressure be sufficient to lift the head out of the notch, a button head that will turn easily may, under such pressure, be worked from one position to the other by the strain upon the curtain. This difficulty could not be met by increase in the strength of the spring, nor by any intricate method of locking, because of the small size of the head of the button, which has to be turned with the fingers, and the need of making application easy. In the generally accepted form of button, therefore, two depressions or grooves are now made in the face of the eyelet into which the ends of the rib or lower side of the button head will fall or rest, when the button head is turned across the eyelet or in locked position.

It is manifest that the necessity (as well as the means) for causing the button head to assume a certain position, under all circumstances, as a guard against carelessness in operating, is distinct from the necessity or means of holding the button head in the locked position. But the strain of the curtain may produce the tendency to turn back to the unlocked position, whether the possibility of so doing arises from carelessness in placing the button or from the ability of the wind pressure to lift the button head against the spring holding it in the groove.

The use of means to always seat the button head in a proper position is protection against carelessness in setting when the wind pressure occurs. The means for locking or preventing the head from turning is a safeguard against the results of the wind pressure in its tendency to turn the button head, even though the button head may have been properly placed at the outset. The grooves or depressions in the eyelet have the effect of holding the rib or convex portion of the under surface of the button head more firmly against turning from the crosswise or locked position, in direct proportion to the increase in pressure of the curtain with the eyelet against the button head. The renewal of such pressure when a curtain is flapping produces but a succession

of similar strains, if these grooves and depressions in the eyelet are large enough so that the button head must each time the curtain flaps, find itself within the depressions of the grooves. A proper proportioning of the parts allows the same protection and accomplishes these results even when the shank or stud of the button is lengthened, and provides for two or three curtains to be held by the same fastener, whether one, two, or three of the curtains is in place.

The evidence shows that a fastener, made according to the specifications and drawings of the Murphy patent, will meet the requirements above set forth, and it was with those purposes in view that Murphy perfected the form of fastener on which he applied for a patent. His application was immediately rejected in the patent office, upon certain patents which will be considered in connection with the prior art, viz., Curtis and Snell (which have been referred to) Pomeroy, No. 335,306, February 2, 1886, and Steffey, No. 373,860, November 29, 1887.

The drawings of the Murphy application, as well as the language of his specifications, show that he intended to secure precautions against careless use in placing the button, by making it impossible, without great effort or care, to leave the button set in any position other than unlocked (so as to pass through the eyelet) or locked across the eyelet. After correspondence with the Patent Office, he amended the description of his structure by specifying grooves in the end or head of the stud, of greater diameter than the smaller dimension of the eyelet and of the stud itself, but let into the end or face of the stud only to such an extent as to cause, by the intersection of these transverse grooves, ridges or curved intersections radiating from the center of the stud to the highest point of its surface, and from these high points again immediately falling away to the intersections of the outside of the stud with the bottom of the groove. He also described a distinctly convex lower face for the turn button, and as the diameter of the grooves was greater than the thickness or small dimension of this turn button, it is evident that the turn button would come to rest only at the bottom of a groove, when not bearing upon one of the so-called ridges. Upon these, it would not ordinarily remain because of the angle of the ridge and the pressure of the spring.

Murphy also included in his original application a claim covering this form of fastener, having an eyelet with the two grooves on opposite sides of the short diameter of the opening. No discussion of that claim in particular was had, and the Patent Office finally issued the Murphy patent with five claims, of which we need here consider but claims 1 and 5, although the remaining three are exactly the same as claim 1, so far as the devices of the defendant and the questions of this case are concerned.

Claim 1. "As an article of manufacture, a curtain fastener comprising a male and a female member, said male member formed in two parts one rotatable upon the other, one of said parts provided with two grooves separated by sharp radiating ridges formed by said grooves, the other of said parts having a convex portion adapted to engage and fit said grooves."

Claim 5. "As an article of manufacture, a curtain fastener comprising a male and a female member, said male member consisting of a base provided with two grooves of substantially semicircular cross section separated by sharp radiating ridges formed by said grooves, a rotatable stud provided with

214 F.—25

a convex portion adapted to engage said grooves, and a spring adapted to hold said stud against said base, said female member provided with an aperture adapted to receive said male member, and two diametrically opposite depressions adapted to receive two corners of said stud."

It appears from the testimony that the Murphy Company has always manufactured its output of brass, with a cast base or plate to be attached with some form of screw to the framework of the carriage, automobile, or boat. The button head has also been cast and shaped with a die, and in the year 1909, the circle with an inclosed "M" was struck upon each side of the button head, and this device filed as a trade-mark in 1911. There has been, naturally, no attempt to patent the use of any particular material, and for a number of years, according to the testimony, other manufacturers have made fasteners from stamped brass, or with partially stamped and partially struck parts, under license from the Murphy Company, and have placed these devices upon the market without the Murphy trade-mark. In addition, as has been stated, the Murphy Company have filled orders, since the registering of their trade-mark, in which the "M" has been omitted from the circle. Some of the companies (now manufacturing under licenses from the plaintiff) and the defendant company have had *brass* turn buttons or fasteners upon the market, of the old Snell or Curtis patterns, for many years. When the defendant company first produced a turn button with a brass head fastened by a rivet to the shaft, or in shaping the flat head of the old Snell and Curtis buttons to allow opportunity for easy operation with the finger tips, a certain mark from the machinery used, which furnished an additional grip for the fingers, was left upon the head. After the Murphy Company used, in the same position, the circle with the letter "M," the defendant changed its die, and for a short time used a circle with a dot in the center, very much similar to that which the Murphy Company has subsequently used in making up orders for other customers.

The Murphy Company has never taken out a design patent, and while for a time the use by the defendant of the circle with a dot caused some resemblance to the Murphy trade-mark or button, yet the discontinuance of the use of this circle, and the fact that the Murphy Company have also put goods upon the market with a circle without the "M" make it impossible to hold that there has been any actionable infringement of trade-mark, even though, while the defendant was using the circle, sufficient confusion might have been caused to require the defendant to cease.

On the question of unfair competition, the case rests upon two charges: First, that the defendant imitated the Murphy product as soon as it appeared to be successfully meeting the demand of the trade; and, second, that the defendant's goods have been actually sold to supply a call for the Murphy fasteners.

Taking up the second point first, it is shown that the trade has come to recognize the Murphy fastener, or the Murphy type of fastener, and that the Ford Automobile Company is calling for the Murphy type of fastener as a specification for the curtain fasteners for its enormous output of automobiles at the present time, while the Packard

Company, which previously had used a more expensive form of fastener, is now also using fasteners of the Murphy type.

This so-called Murphy type includes a grommet or eyelet, with the depressions or notches in the line of the shorter diameter, and a button having a convex undersurface to rest at each end in the grooves of the eyelet, with the grooves upon the top of the stud of larger diameter than in the old Climax or Perfection button, and with the two grooves forming by their intersection a more or less crescent-shaped ridge, up to the highest point or shoulder, at substantially 45 degrees between each permanent resting place.

Leaving the question of unfair competition until it is seen what features of this fastener the defendant has the right to use, it will be necessary to take up the question of the patent and consider first the matter of infringement.

The defendant's button is made entirely of stamped metal, but adapted for application to the same sort of surfaces as the solid fastener of the plaintiff. The head or turn button part of the fastener in the defendant's structure is substantially like the plaintiff's head, but with more rounded corners like the old fasteners; and when the defendant was using tools leaving a mark upon the side of this button, or was impressing a circle with a dot thereon, the resemblance of the two fasteners was even more complete.

The underside of the button heads of the two fasteners is substantially the same, and the height of the stud is shortened or lengthened according to the needs for fastening one, two, or three curtains. The only point of difference which is urged by the defendant, from the standpoint of infringement, is in the shape of the high points or ridges and the sharpness of the declivity or edge of the intersections leading thereto.

It is obvious that in making a structure of stamped brass, the bends in the material cannot be so abrupt, nor the edges of a bent-over surface left as sharp, as in a cast structure. The wear of the parts in turning decreases the sharpness of such an edge in a stamped fastener more than in the cast fastener. The defendant's buttons, because of this difference, can with less difficulty be set at some point other than in the grooves where they are intended to remain. Either from carelessness or by design the button can remain at substantially the 45 degree position until it is dislodged. But it is evident that the pressure of an automobile curtain or the flapping of the same would have the same effect as in the solid button, and that the head, when removed from immediate contact with the top of the stud, will turn to either one or the other of the groove positions, because of the greater room for exertion of the force of the spring with the large grooves than if the top of the stud were flat and the resting places broad between the two grooves.

The eyelets of both parties are substantially the same except for very slight differences in the shape of the grooves and the fact that some of the defendant's back plates are perforated. Some of the fasteners made by the plaintiff, through poor workmanship or defect in the metal, will allow the button head to stand at practically the 45 de-

gree position, when the fastener is not subjected to the pressure of the curtain. But there would seem to be no difference in actual use, and no apparent merit in the claim of noninfringement if the patent is valid.

The defendant has offered upon the question of anticipation a number of the old so-called Perfection fasteners of its own manufacture and the old Climax fasteners made under the Snell and Curtis patents. Also certain other fasteners of similar type, put upon the market by other firms prior to the date of the application by Murphy to the patent office have been shown.

In so far as the question of invalidity from lack of novelty raises precisely the same differences, we need not consider these questions of anticipation by themselves. It is evident that the use of a brass eyelet with a back plate, of an ovoid button head, with a horizontal groove or mark for the finger grip, of a stud and button (made so as to pass through the eyelet in its longest diameter, but unable to turn in the shorter diameter of the eyelet), and the adaptation of these devices to the different needs of attachment, were all old. The defenses of anticipation and lack of patentability would be sufficient if any claim of patentability were based thereon. But as to the question of patentability itself, the alleged novelty of the idea used in changing the old Climax or Perfection button into the button described in the Murphy patent, and the precise form of button which is shown by the claims of the Murphy patent, must be considered.

[3] Claim 5 of the Murphy patent differs from claims 1 to 4, as has been said, only in the use of the eyelet with grooves or depressions, in combination with a fastener such as is described in the first four claims. Sometimes invention may lie in the mere application of an old device to some use in combination with another old device, where the result forms a complete device of itself, and where the novelty is found in the application of the two devices as parts of one complete means for producing the new result or the old result in a new way.

In the earlier part of this opinion we discussed the divisibility of the device described in claim 5 of the Murphy patent, from the standpoint of provisions for bringing the head to certain positions, and to come to rest in the grooves at those positions, as distinguished from the means for holding the head in a fixed position after it had come to rest. So far as holding the head in the fixed position by means of the eyelet is concerned, when outward pressure is applied by the eyelet to the turn button head, there would be no novelty in describing a combination of the eyelet with one head, which can be turned by certain means, rather than with a different head, which can be more easily turned to the position where it is to be held, or can be brought to that position by a greater number of means. In other words, the eyelet with the grooved depressions could be used with the Climax or Perfection buttons, and if we leave out of consideration the question of turning a Climax or Perfection head into the grooves, no more invention is needed to keep the Climax head therein than to keep the Murphy head. Recognition of the fact that wind pressure upon automobile curtains makes it desirable to have a head which will stay fixed is but a recognition of an

old principle, no matter what form of button head may be used. This idea was expressed definitely, for exactly the same purpose, with exactly the same performance of function, and with the use described in exactly the same way, in the Steffey and Pomeroy patents previously mentioned. In the Pomeroy patent the interference of the groove or ring with the turning of the button, and the pressure of the eyelet or ring itself, furnishes the identical situation presented with the use of the Murphy device, when the curtain pulls against the button head. But in the Steffey patent we have the additional recognition of the locking principle furnished by the pressure of the curtain against the button or head, which holds a metallic eyelet in such position that the head cannot turn out of a groove or slot. To use the Steffey device to accomplish exactly the same purpose, and to perform precisely the same function in the same way, is but an aggregation of an old shape of eyelet, made in the precise method described by Steffey, to produce the same results covered by his patent and that of Pomeroy.

So far as claims 1 to 4 are concerned, they are not different in this respect, even assuming that they, as well as claim 5, describe the Murphy device, and we must therefore pass on to the claim of novelty, which seems to have satisfied the Patent Office and to have secured the allowance of the patent.

It has been pointed out by the defendant that the plaintiff's turn button is not forced out against the spring by the so-called ridges, but rather by the ascending crescents or intersections, and that as soon as the button reaches the ridge, it immediately passes over and starts down to rest in the other groove. The Murphy patent as finally allowed by the Patent Office speaks in all the claims of "sharp radiating ridges," and it is evident that what has been referred to as the ascending crescent intersections may be called "radiating ridges," but that the long slopes to the outside of the stud are not "radiating ridges" in any sense of the term. When the button head is being turned in one direction, the elevation is not caused by the long outside ridges or slopes, but by the intersecting crescents, which are only one side of the ridge. This variance need not be deemed material, for the purpose and description of the so-called "radiating ridges" is so plain and definite, in so far as any novelty was found by the Patent Office, as to make the meaning of the claims plain, and to make it apparent that the defendant's structure, as well as those of the manufacturers operating under licenses, make use of the principles set forth in the claims as allowed, and that the changes from the Climax and Perfection fasteners have been based upon this principle.

It is simply what has been previously described as the use of a groove of large enough diameter to insure intersection to the summit of the elevation at each corner between the sides of the grooves, and with the necessary corresponding falling away on either side of this summit, so that the spring may easily bring the button head to rest in the groove, and so that there will be no extensive support for the button head upon the top of these ridges or summits. It will be seen from this standpoint that whether the lower side of the button head shows in section a convex curve for its outer surface, or whether it

shows in section substantially a V, would make no difference. It would be convex as called for in the patent, for the purpose desired, in either form. But the use of such ridges or grooves was novel only in that it had not been found necessary to make the old form of button fastener in such an exact manner for holding carriage curtains; and, when the need for this fastener came with the automobile, the application of means to meet the need, was not the discovery of a new means, but merely the recognition that the need was the same as one which had been previously known, and which probably could be traced through many arts. But the Patent Office cited only the patents which had been granted with reference to button fasteners, and it now appears that the patent was issued without actual consideration of other patents relating to appliances for harness and carriages, not to speak of other arts in which precisely the same need of protection against the same sort of strain was met in exactly the same way. The patent described a device which any one had the right to use at the time the Murphy application was filed.

The Quickel patent No. 484,746, October 18, 1892, was for a whiffletree end, in which the stud or shaft of the fastener was made to carry the pull of the trace, and a turn button head was held in place by a spring within the fastener. This head was so arranged that the longer diameter of the turn button head would pass through the slit in the trace, and then, upon being turned across this slit, would force into contact with the stud, against the resistance of the spring in question, sharp ridges (radiating at a right angle from the center of the shaft on which the turn button was mounted). These two ridges met diametrically opposite sharp ridges upon the part of the stud carrying the spring, and thus there was no place where the turn button head could come to rest except when one of these ridges was down in the groove, which would set it in one or the other positions of rest.

This idea of Quickel is but a modification of a much older patent which, strange to say, much more nearly pictures the button head of the plaintiff and defendant in suit, and suggests exactly the so-called ridges and grooves of which advantage can be taken by the pressure of a spring inside of the head, and in which the radiation of the ridges is but a necessary result or an immaterial feature of their construction. In other words, the patent to Van Wagner, No. 96,852, November 16, 1869, avoids the inconsistencies contained in the use of the words "sharp radiating ridges" which the Patent Office insisted upon in the case of the Murphy patent, but does present precisely the same means of procuring the same result and to resist an exactly similar strain. This Van Wagner patent is, again, for a device called a whiffletree hook, for use upon a carriage or wagon, to provide a head which shall slip through the long dimension of the slit in the end of the trace, and, by turning the head to a right angle, will leave that head across the trace, to stand the whipping strain caused by the back and forth movement of the whiffletree or evener bar, and accomplishing the certainty of holding the head of the turn button in one or the other of the grooves, by making the ascents sharp and the diameter of these grooves greater than the thickness of the button head in its smaller dimension.

This is precisely the idea of the Murphy patent, and while great commercial utility, great practicability, and great advantage is evident in making the old form of carriage button in this better and more certain way, yet the necessity which required the more accurately and certainly operating device cannot furnish novelty or patentable invention to the use of well-known means for accomplishing that result, merely because of immediate recognition by the public that the means does accomplish the result.

As has been said, there are probably other arts in which exactly the same principles have been used to produce exactly the same result. The patent to Booth, No. 286,770, October 16, 1883, which was also not considered by the Patent Office, was for a collar button, and shows the same idea of inserting the button head through the buttonhole and then securing it by turning it at a right angle and by having two radiating or intersecting grooves, which necessarily would form radiating or intersecting ridges in the head of the stud, and with these grooves of sufficient diameter to allow the button head to come to rest only at the bottom of one or the other of the grooves.

These conclusions bring us to the determination that the Patent Office could not have found patentable novelty in the Murphy application, if they had been considering anything except the turn buttons which had been available for use upon carriages, and, while we must presume that the Patent Office took into account and examined everything in the prior art, we can only assume that this was done by finding that their action was erroneous if they failed to cite such patents as Van Wagner, Quickel, and Booth against the Murphy application.

It appears from the record, further, that two applications for whiffletree fasteners of similar type had been rejected and abandoned, viz., J. W. Bishop, September 8, 1864, and Lucius Jordan, October 4, 1866, which were rejected upon the spring catch button patent of Reed & Packard, No. 43,928, August 23, 1864, and which show that even earlier than Van Wagner, the ideas made use of by Murphy were known in an analogous art.

These determinations upon the question of invalidity dipose of the points raised by similarity of the devices in question, and the other points of resemblance are plainly not patentable, nor included in the Murphy claims.

[4] But to return to the question of unfair competition, it is charged that the similarity of the device is an evident attempt to copy the Murphy button, after acquiescence by the public, and after recognition thereof as a type of commercial article. In so far as the Murphy button was an adaptation of the old form of button to the use of an automobile, by embodying the precise means of accomplishing a certain bringing to rest of the button head through employment of a type of groove which would produce that result, any manufacturer would have the right to do the same, in the same manner, unless the Murphy patent were valid.

This immediately removes many of the questions of so-called imitation. A number of exhibits have been introduced in the case, about

which litigation seems to have been previously inaugurated, and most of which are now manufactured under some sort of a license.

If the Murphy patent is invalid, then the licensing of other manufacturers to place upon the market exactly similar devices, without distinguishing labels, and without any means of warning the public that the idea belongs to the plaintiff, would be like the publication of a book without the notice of copyright. To place a label upon a box containing a gross of fasteners, and to label that package with a different name than that used by the Murphy Company, with a statement merely of the date of the patent, but with no reference to the name of the patentee, would be sufficient to warn tradesmen and dealers who were handling the unbroken package that some patent existed. But button fasteners, when applied to any automobile, would given no notice either of the existence of an alleged patent nor of any particular kind of button fastener other than a brass fastener of the type placed upon the market by a number of different dealers, and generally being an adaptation of the older brass fasteners previously in use, unless each button were stamped with the patent notice.

The Murphy patent made it possible to call fasteners of this shape "Murphy" fasteners, in the same way that they could have been distinguished by being called brass fasteners, if some one could have obtained a patent for making such fasteners of brass. But unless bearing a distinctive mark like the Murphy trade-mark, or some distinctive feature which had become known to the public as the property, that is, the commercially available idea, of Murphy (such as the depressed groove would be if this had been original with him), there is nothing about the so-called Murphy type of button fastener which renders it the exclusive property of the Murphy Company, or which would entitle them to a decree on the ground of unfair competition, merely because of the resemblance of the article and apart from the rights under their alleged patent.

As to sales at the store of the defendant, it is evident that the Murphy Company did not attempt to put stamped fasteners on the market except through their licensees. It is evident that the defendant company previously purchased fasteners from the Murphy Company, and that their catalogues have since the issuance of the Murphy patent shown what they called the New Standard Curtain Fastener, which are of the so-called Murphy type. In the particular sales on the 19th and 20th of April, 1911, by a clerk of the defendant company to a representative of the plaintiff, the difference between the versions of the two men as to the statements used by the clerk becomes substantially immaterial. If the defendant had a right to sell only fasteners made by the Murphy Company, to some one who wished a genuine Murphy fastener, but did have the right to sell any fastener of the so-called Murphy type, whether made by the defendant or by other persons, to any one who was not deceived into thinking that the fastener was made by the Murphy Company, no issue remains. The representative of the plaintiff was asking for what he considered Murphy fasteners, that is, fasteners made under the Murphy patent. The defendant's representative was selling a so-called Murphy fastener or Murphy type of

fastener made by themselves. But there seems to have been no actual misrepresentation or deception, and no statement by the clerk that the fasteners were made by the Murphy Company. The case therefore does not fall in any aspect within the radius of an action for unfair competition. The claims of the patent cannot be held valid for the use of an eyelet with grooves together with a turn button fastener, nor for the use of a fastener with a turn button head of the Van Wagner type, nor would there seem to be any actionable use of anything which could be confused with the Murphy trade-mark since the registry of that trade-mark. Prior to that time the benefit of the ownership of the device (a circle with a dot inside) by the plaintiff, has been completely nullified by the testimony that goods bearing this device had been furnished to other customers for sale in the open market, and by the fact that the use, if even in imitation of the Murphy article, has been discontinued and equitable action is unnecessary.

The defendant may have a decree with costs.